UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRUCE SCHMUTTER and DEAN SAMET, On Behalf of Themselves and All Others Similarly Situated,<br><br>                                    Plaintiffs,<br><br>                    v.<br><br>ARRIVAL SA, DENIS SVERDLOV, TIM HOLBROW, MICHAEL ABLESON, and AVINASH RUGOOBUR.<br><br>                                    Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br><br>JURY TRIAL DEMANDED |

Plaintiffs Bruce Schmutter and Dean Samet ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, hereby bring this Class Action Complaint for Violation of Federal Securities Law ("Complaint") against Arrival SA. ("Company" or "Arrival") and Denis Sverdlov, Arrival's Founder and Chief Executive Officer ("CEO"); Michael Ableson, Arrival's CEO of Automotive, Tim Holbrow, Arrival's Senior Vice President, Strategic Finance; and Avinash Rugoobur, Arrival's President and director (collectively, "Individual Defendants," and together with the Company, "Defendants"). The Complaint is based upon, *inter alia*, the investigation conducted by counsel, which included a review of the Company's public documents, conference calls, and announcements, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, analysts' reports and advisories about the Company and other information. Plaintiffs' counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Company

and the Individual Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired common shares of Arrival stock between November 18, 2020 and November 19, 2021, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violation of the federal securities laws under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Arrival (formerly Arrival Luxembourg S.à r.l.) was founded in 2015 as a private company headquartered in London, UK.  Arrival is a manufacturer and distributor of commercial electric vehicles ("EVs"), including vans, cars, and buses. Arrival develops vertically integrated technologies and products that create a new approach to the assembly of EVs. According to Arrival, its proprietary in-house developed components, materials, software and robotic technologies, combined with low capital expenditure and rapidly scalable microfactories, enable Arrival to produce EVs that are competitively priced to traditional fossil fuel vehicles and with a substantially lower total cost of ownership for customers.

3.      On March 24, 2021, Arrival consummated a business combination (the "Merger") with CIIG Merger Corp. ("CIIG"). Prior to its business combination with Arrival, CIIG was a special purpose acquisition company ("SPAC"), also known as a "blank check" company, incorporated for the purpose of entering into a merger, share exchange, asset acquisition, share purchase, recapitalization, reorganization, or similar business combination with one or more businesses or entities. Upon the consummation of the Merger, CIIG changed its name from CIIG to Arrival Vault US Inc.

2

4.     On March 25, 2021, the Company's common stock and warrants began trading on NASDAQ under symbols "ARVL" and "ARVLW," respectively.

5.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company would record a substantially greater net loss and adjusted EBITDA loss in the third quarter of 2021 compared to the third quarter of 2020; (ii) the Company would experience far greater capital and operational expense to operate and deploy its microfactories and manufacture EV vehicles than it had disclosed; (iii) the Company would not capitalize on or achieve profitability or provide meaningful revenue in the time periods disclosed; (iv) the Company would not achieve its disclosed production and sales volumes; (v) the Company would not meet the disclosed production rollout deadlines. Accordingly, the Company materially overstated its financial and operational position and/or prospects, and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

6.     Investors learned the truth about the real status of Arrival's financial and operational health through a series of disclosures beginning on November 8, 2021. On November 8, 2021, Arrival announced the Company's financial results for the third quarter of 2021, including a loss of €26 million (compared to a loss of €22 million during the same quarter a year earlier), and adjusted EBITDA loss for the quarter of €40 million (compared to a loss of €18 million in the third quarter of 2020). The Company also pulled its 2022 revenue goals and significantly scaled back its long-term projections, pushing its production and sales timeline into later time periods.

7.     On this news, shares of Arrival plummeted $4.33, or 24%, to close at $13.46 on November 10, 2021 on unusually high trading volume.

8.      Only a week later, on November 17, 2021, Arrival announced a $200 million offering of green convertible senior notes due 2026, intended to finance the development of EVs. On the same day, November 17, 2021, Arrival announced the commencement of an underwritten public offering of 25 million ordinary shares pursuant to a registration statement on Form F-1 filed with the SEC in a bid to raise around $330 million in cash.

9.      On this news, Arrival shares dropped $0.82, or approximately 8%, to close at $9.91 on November 18, 2021 on unusually high trading volume.

10.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under Section 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

13.     Venue is proper  pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as the alleged misstatements and omissions were made or omitted, and the subsequent damages took place in this Judicial District. Pursuant to Arrival's most recent annual report (SEC Form 20-F filed April 30, 2021), as of December 31, 2020, Arrival had 606,157,267 Ordinary Shares and 20,112,500 Warrants to purchase Ordinary Shares. Arrival's common stock trades on the NASDAQ. Accordingly, there are presumably hundreds, if not thousands, of investors in Arrival's common stock located within the U.S., some of whom undoubtedly reside in this judicial district.

14.     In connection with the acts alleged in this Complaint, Arrival, directly or indirectly, used the instrumentalities of interstate commerce, including interstate wires, U.S. Postal Service mail, wireless spectrum, and the national securities exchange.

## PARTIES

15.     Plaintiff Schmutter is a resident of Brooklyn, New York. As set forth in the attached Certification, incorporated by reference herein, Plaintiff Schmutter acquired Arrival shares during the Class Period, at artificially inflated prices, and was damaged by the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

16.     Plaintiff Samet is a resident of Branson, Missouri. As set forth in the attached Certification, incorporated by reference herein, Plaintiff Samet acquired Arrival shares during the Class Period, at artificially inflated prices, and was damaged by the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

17.     Defendant Arrival or Arrival Luxembourg SARL (formerly Arrival S.a.r.l.) is a limited liability company (société à responsabilité limitée) governed by the laws of the Grand Duchy of Luxembourg. Arrival's shares are publicly traded on NASDAQ under the ticker symbol "ARVL."

18.     Defendant Denis Sverdlov ("Sverdlov") founded and has served as the Company's CEO since 2015.

19.     Defendant Tim Holbrow ("Holbrow") has served as the Company's Senior Vice President of Strategic Finance since August 2021. He has served as the Interim CFO between August 2019 and August 2021.

20.     Defendant Michael Ableson ("Abelson") has served as the Company's CEO of Automotive since October 2019.

21.     Defendant Avinash Rugoobur ("Rugoobur") has served as the Company's

President since July 2020 after initially joining as the Chief Strategy Officer for Arrival in March 2019.

22.     The Individual Defendants possessed the authority to control the contents of statements made by Arrival in the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.,* the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Due to their positions with Arrival, and their access to Arrival's material information that was unavailable to the public, the Individual Defendants knew that the adverse facts described herein were not disclosed to and were being concealed from investors. The Individual Defendants are liable for the false statements and omissions alleged herein.

## SUBSTANTIVE ALLEGATIONS

### A.     Materially False And Misleading Statements Issued During The Class Period

23.     The Class Period begins on November 18, 2020 when Arrival announced in a press release its plan to go public through a merger with CIIG. In the press release titled *Arrival to list on NASDAQ through merger with CIIG Merger Corp.* Arrival touted its "game-changing technologies," including its ability to deploy its microfactories "anywhere in the world within six months, using existing warehouses close to areas of demand." Additionally, Arrival claimed its "vertical integration and new method of production . . . [is expected to] enable profitability for the business by 2023." As to Arrival's existing orders, Arrival claimed to have "signed contracts with total order value up to US $1.2 billion and its first products are planned for production in Q4 2021." These orders included a commitment by the United Parcel Service ("UPS") to purchase 10,000 electric vans and an additional option to order more thereafter.

24.     In an investor presentation dated November 18, 2020[1], Arrival reiterated its claims of having revolutionized the commercial EVs industry and providing specific production timelines, revenue growth, capital expenditures, model rollouts, existing orders, and facility infrastructure. For example, Arrival represented that it expected "[f]our vehicle designs . . . in market by 2023, with start of production for the first vehicle planned for Q4 2021." Arrival's product pipeline included: (i) an electric bus; (ii) electric van; (iii) large electric van; and (iv) small vehicle platform, with expected start of production in Q4 2021, Q3 2022, Q3 2022, and Q3 2023, respectively.

25.     Critically, Arrival represented its financial profile — "supported by $1.2 billion in orders and notable commercial and strategic partnerships" — positioned the Company to be profitable in March 2023 and to generate a $14 billion revenue in 2024. To that effect, the investor presentation contained several slides highlighting Arrival's financial profile's "strong cash generation" and "high profitability." and also contained enterprise value benchmarking analyses comparing Arrival's sales and EBITDA figures to those of its competitors, including Nikola, Workhorse, Fiskar, Lordstown, and others.

26.     In the same presentation, Arrival also touted its microfactories as possessing significant advantages over traditional auto factories in being "highly scalable," requiring low capital and operational expenditures, and being easily deployed within 6 months. Arrival's microfactory timeline showed three facilities deployed by 2023 and having the capacity to produce 10,000 vans per year, each with capital and operational expenditure of $44 million and $12 million, respectively.

---

[1] The Investor Presentation was filed with the SEC on Form 425 on December 15, 2020.

27.     Defendants' representations in ¶¶ 23-26 were false and misleading because Arrival: (i) could not deploy its microfactories in the projected timeline; (ii) its vertical integration and method of auto manufacturing did not allow Arrival to become profitable by 2023; (iii) Arrival could not begin production model rollout in the projected timelines; and (iv) could not achieve the production volumes and capacity it had stated that it would.

28.     On December 15, 2020, Arrival filed a preliminary Registration Statement on SEC Form F-4, as amended on January 21, February 16 and February 25, 2021, signed by Defendants Sverdlov and Holbrow and Directors Analolitis, Dusemon, and Horvath. The Registration Statement incorporated the Preliminary Proxy Statement for Special Meeting of CIIG Merger Corp. and Prospectus for Ordinary Shares and Warrants of Arrival Group (the "Registration Statement").

29.     The Registration Statement described touted Arrival's business model as being based on "core technologies that enable the production of vehicles through its game changing proprietary microfactories" while requiring lower capital investment and greater profitability:

> Numerous factors contribute to ***Arrival's expectation that it will achieve lower capital investment requirements across its owned and controlled ecosystem while also positioning Arrival to achieve greater profitability relative to other OEMs***. At comparable annual production volumes, the capital investment for Arrival's microfactories is estimated to be 50% less than a traditional OEM production facility. A primary driver of these cost savings is the use of Arrival's proprietary composite materials that do not require capital intensive metal stamping plants, welding facilities or paint shops. ***Arrival's expectation is to achieve market-leading profitability within the electric vehicle industry due to the lower operating expenditures associated with its microfactories, lower procurement costs associated with its in-house plug-and-play modular components and proprietary composite materials as well as the utilization of its proprietary in-house software architecture that reduces its manual labor expenses within the microfactories***. Arrival estimates that its operational expense saving associated with its microfactories to be approximately 50% when compared to a traditional OEM facility with a similar production capacity. These savings, when combined with other operational and procurement savings,

position Arrival to achieve double-digit margins on a per vehicle basis. Arrival believes this level of profitability to be industry leading.

30. The Registration Statement highlighted Arrival's ability to rapidly deploy and scale its microfactories while doing so with low expenditures:

*Scale*

A key attribute to the implementation of microfactories is Arrival's ability to scale globally. ***Arrival estimates its microfactories can be fully operational within six months of leasing an appropriate warehouse.*** Arrival believes there is an abundance of warehouses globally that are suitable to be microfactories. ***The low expected level of capital investment per microfactory also allows Arrival to deploy microfactories in numerous metropolitan communities with less capital than required for a traditional OEM facility***. Arrival believes the deployment of its microfactories into local communities will be well-accepted by governments and municipalities based on its ability to offer local jobs and to pay local taxes. Arrival believes that every city with over one million inhabitants has sufficient vehicle demand to support at least one microfactory. Globally, Arrival estimates there are more than 500 cities with a population of more than one million.

31. As to Arrival's existing and potential orders for its EVs, the Registration Statement provided in relevant part:

***UPS . . . has agreed to purchase 10,000 vans during the period of 2021 to 2025 with an option to purchase an additional 10,000 vans representing up to $1.2 billion (€1.0 billion) in revenue***, subject to modification or cancellation. The UPS order covers three different van configurations and the following geographic regions: North America, Europe and the UK. At the start of each calendar year, Arrival has agreed to issue UPS an invoice for a deposit of 25% of the projected vehicle volume designated for that calendar year. In connection with the UPS order, in October 2020, Arrival entered into an agreement with UPS whereby Arrival agreed that Holdco would enter into an agreement with UPS to issue Holdco Warrants to UPS upon certain conditions being met.

\* \* \*

. . . Arrival has also received non-binding memorandums of understanding from 16 customers expressing strong interest in the Arrival Van and Arrival Bus. Although non-binding, Arrival believes they demonstrate clear demand that will lead to binding orders once they begin production of the Arrival Bus and Arrival Van and potential customers are able to see firsthand the performance and value of these vehicles.

32.     The Registration Statement provided assurances about Arrival's vehicle development timeline and sales process:

> Arrival has four vehicle programs currently under development: the Arrival Bus, Arrival Van, large van and small vehicle platform. ***Arrival expects to commence production of its Arrival Bus by the end of 2021 with sales expected to begin in early 2022. The Arrival Van is scheduled to start production and sales in the third quarter of 2022***. Arrival has made significant progress in the design of its EVs and components parts, as well as in the development of its manufacturing and assembly processes and vehicle and manufacturing technology platform[].
>
> * * *
>
> Arrival must successfully complete certain development activities in order to meet its expected production dates. Arrival expects to complete bus product validation and van product validation, in 2021. ***The large van product validation is expected to follow in the first half of 2022***. Arrival's team of over 1,400 employees, including engineers, scientists, technicians and staff ***is committed to achieving the necessary milestones to meet its current production and commercialization timelines.*** However, delays may occur as a result of the development process, initial production hurdles and COVID-19.

33.     The Registration Statement touted Arrival's "proprietary microfactory concept," stating as follows:

> Each microfactory is designed to provide several competitive advantages for Arrival ***including lower capital investment and operating costs as well as efficient scalability***. The size of each microfactory will be approximately 200,000 square feet ***and will be able to manufacture 10,000 vans per year or 1,000 buses per year assuming two shifts per day***. Each microfactory will be staffed with approximately 250 employees. ***Arrival anticipates each microfactory will take approximately six months to complete***. This reduced timing compared to a traditional OEM manufacturing facility is enabled by the absence of metal stamping and there being no requirement for a paint shop. Arrival can therefore outfit existing warehouses and avoid lengthy permitting approvals generally associated with paint shops.
>
> The capital investment required for each microfactory is estimated to be approximately $45-$50 million while the annual operating expenses per microfactory are estimated to be approximately $12 million. ***When comparing to a traditional OEM assembly plant's volume of 100,000 vans/year, Arrival estimates the cost structure aggregated across ten of its van microfactories would result in an approximate 50% savings in capital investment and approximately 50% savings in annual operating expenses compared to the cost structure of a traditional OEM facility.***

> ***Arrival believes each microfactory can achieve an annual gross margin of $100 million per year, assuming either 10,000 vans or 1,000 buses are manufactured and sold per year.*** Arrival believes the efficiency in its microfactory cost structure positions Arrival to be free cash flow positive, after allowing for its global overhead expenses, once Arrival reaches full production and sales for three currently planned microfactories.

34.     Relatedly, the Registration Statement confirmed that Arrival "ha[d] two microfactories currently being commissioned [and that it] plans on establishing 31 microfactories by 2024."

35.     On February 22, 2021, Arrival published a press release in which it reiterated its claims of revolutionizing the automotive industry and its plans to deploy the first two of its microfactories:

> Arrival is reinventing the automotive industry with its entirely new approach to the design and assembly of electric vehicles. Low CapEx, rapidly scalable Microfactories combined with proprietary in-house developed components, materials and software, enable the production of best in class vehicles competitively priced to fossil fuel variants and with a substantially lower total cost of ownership. . . . The company is deploying its first two Microfactories in South Carolina, US and Bicester, UK in 2021.

36.     On March 1, 2021, Arrival issued a press release announcing that its Registration Statement had been declared effective by the SEC and setting a date for the special meeting of stockholders for March 19, 2021. The press release reiterated Arrival's commitment to begin "commercial Bus and Van models . . . production at the end of this year and beginning of 2022 respectively." The press release also assured investors that "***Arrival remains well-placed to capitalize on this enormous opportunity*** through EV products that are price competitive to diesel equivalents."

37.     On March 17, 2021, Arrival issued a press release titled "*Arrival Announces New Microfactory Producing Electric Delivery Vans in Charlotte,*" in which the Company announced that it "will be building its second US Microfactory in Charlotte, North Carolina . . . expected to

begin production of [Arrival electric delivery vans] by Q3 2022." The press release reiterated Arrival's previous claims its microfactories are "low CapEx, have a smaller footprint than conventional factories, have the ability to create significant unit economics. . ."

38.    On March 20, 2021, Arrival shareholders approved the Merger with CIIG and Arrival's shares began trading on NASDAQ on March 25, 2021 under the ticker symbol "ARVL".

39.    In a statement provided for Reuters on March 25, 2021, Defendant Abelson assured investors that "[w]hat you'll start to see now is the footprint start to expand pretty dramatically." Defendant Rugoobur echoed Abelson's bullish claims, adding that "[w]hat we're going to see is basically a microfactory in every major city around the world . . . .*You'll see the rollout expand pretty rapidly.*"

40.    Defendants' representations in ¶¶ 29-39 were false and misleading because Arrival: (i) understated the capital investment and operating expenditures required to operate and deploy its microfactories; (ii) provided investors with overly aggressive production and sales projections; (iii) provided investors with unrealistic targets as to the Company's production capacity and volumes; and (iv) overstated its ability to capitalize on the EVs production and achieve profitability in the projected timeframe.

41.    As a result, Defendants' false and misleading statements about Arrival (¶¶ 23-40) inflated its stock price both before and after the Merger.

42.    On April 30, 2021, Arrival filed its Annual Report on SEC Form 20-F, as amended on May 27 and August 11, 2021, signed by Defendant Sverdlov ("2020 Annual Report"). In it, Arrival reiterated the same statements it provided in its Registration Statement, including claims regarding: (i) Arrival's proprietary technology which was purportedly going to allow Arrival to achieve greater profitability relative to traditional auto markers as well as other electric vehicle

makers; (ii) its proprietary microfactory concepts and its timeline for their deployment and

production capacity; (iii) its business relationship with UPS and the existing orders for 10,000 vans

with an option to order an additional 10,000 vans, representing up to $1.2 billion in revenue; (iv)

vehicle development timeline and sales process.

43.     Arrival's Annual Statement represented that in addition to its Bicester, UK van

factory and South Carolina bus factory, Arrival leased additional facilities in North Carolina,

stating in relevant part:

> **North Carolina - Van Factory**
>
> In March 2021, Arrival leased two buildings located in West Charlotte, North Carolina, USA. Arrival intends for one of the buildings to be used as a microfactory initially focused on building electric vans with Arrival's vertically integrated approach to vehicle production. The other building will be used as a regional logistics hub to support the adjacent microfactory as well as the microfactory in Rock Hill. Arrival is expected to begin operations at West Charlotte in the first quarter of 2022, with start of production in the third quarter of 2022. The location of the site is well suited for a manufacturing facility due to the trained labor force available in the area, its proximity to several large urban centers and the available logistics links.

44.     Appended as Exhibits 13.1 and 13.2 to the 2020 Annual Report were signed

certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), wherein

Defendants Sverdlov and Holbrow certified that "the [2020 Annual Report] fully complies with

the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934, as

amended" and that the "information contained in the [2020 Annual Report] fairly presents, in all

material respects, the financial condition and results of operations of the Company."

45.     On May 13, 2021, Arrival issued a press release, attached as Exhibit 99.1 to its SEC

Form 6-K, in which it provided an update on its performance during the first quarter ended March

31, 2021. In the press release, Arrival reiterated its claims of greater profitability, stating that

"[m]icrofactories also provide greater profitability for Arrival due to their lower capex and opex

than traditional OEM factories" and that the "rapid scalability of this decentralised production strategy gives Arrival the flexibility to meet the changes and growth in market demand globally." Defendant Sverdlov reassured investors of Arrival's production timeline, stating in relevant part:

> **We continue to expect to have four vehicles - the Bus, Van, Large Van and Car - on the market by the end of 2023, creating the integrated mobility ecosystem cities and governments need to meet their emissions and sustainability targets, beginning with the start of production of the Arrival Bus in Q4 this year.** We are excited for the future.

46.     The press release listed several business highlights, including, among others, Arrival's second U.S. microfactory in Charlotte, North Carolina, expected to produce electric delivery vans in Q3 2022 and a CapEx projection of $50 million for a microfactory being "on track," with the majority of production equipment for the first two microfactories either delivered or on order.

47.     On the same day, Arrival held an earnings call with analysts to discuss the Company's financial performance for the first quarter 2021 ("Q1 2021 Earnings Call"). During the Q1 Earnings Call, Sverdlov claimed that the "start of production of buses is scheduled for Q4 2021 as planned" and that the "**start of production of vans both variants, small and deep [sic] is planned for second half of 2022** and the railroad car is scheduled for the end of 2023." Additionally, Sverdlov reiterated UPS' commitment to purchase 10,000 vans with an option to purchase another 10,000 vans for approximately $1.2 billion. Defendant Rugoobur echoed Sverdlov's claims, stating that "we expect to have four vehicle programs in market by the end of 2023 [a]nd **have made significant progress in the quarter towards that goal.**" As to the large van production, Rugoobur informed investors that "We have found that **we can increase commonality even further between the van and large van [a]nd in order to drive these efficiencies, we have retargeted the large van production to Q4, 2022.**" Later during the Q1 Earnings Call, Rugoobur

reiterated that the four vehicles under development will be in market by the end of 2023 with the "two van variants, the large van and the small – the full-time van in second half of 2022. . ."

48.     During the Q1 Earnings Call, Defendant Ableson reassured investors about Arrival's previous plans to deploy three microfactories at the anticipated CapEx levels. As to the Charlotte, North Carolina factory, Ableson confirmed that the factory "will build vehicles on both our van and large van platforms" and that "the Charlotte microfactory will be capable of producing 10,000 vans per year when operating on two shifts." When asked about throughput expectation for the microfactories, Ableson stated:

> *To get specifically to your question on capacity and throughput, we've done extensive modeling of all of the processes and the systems in the microfactory. So we have very high confidence in that and the work that we've done so far with the actual robotic cells in Bicester confirm that analysis to this point.*

Later during the Q1 Earnings Call, Defendant Rugoobur reconfirmed the same, stating "[a]gain, to be clear, our strategy on microfactories is we're going to be expanding the number of microfactories very quickly [a]nd so we'll move briskly, I would say to add additional microfactories."

49.     An analyst from Cowen & Company pointedly asked Defendant Holbrow about the Company's cash burn and expectations: "… Tim, no changes to the modeling in terms of cash burn or CapEx expectations, it sounds like everything is in track with what you previously disclosed, but I just wanted to confirm[?]" Defendant Holbrow responded, ***"Yes, that's right. Yes. We – obviously, we recently announced our report as part of the closure of the merger we did with CIIG and we're not updating you any guidance to that."***

50.     On June 17, 2021, the Company filed a Prospectus on SEC Form 424B in connection with the issuance of Arrival's ordinary shares, which became effective on November 29, 2021. In the Prospectus, Arrival touted its proprietary technology as purportedly allowing

Arrival to achieve significantly greater profitability than traditional auto makers and electric vehicle makers, stating in relevant part:

> Numerous factors contribute to ***Arrival's expectation that it will achieve lower capital investment requirements across its owned and controlled ecosystem while also positioning Arrival to achieve greater profitability relative to other OEMs.*** At comparable annual production volumes, the capital investment for Arrival's microfactories is estimated to be 50% less than a traditional OEM production facility. A primary driver of these cost savings is the use of Arrival's proprietary composite materials that do not require capital intensive metal stamping plants, welding facilities or paint shops. ***Arrival's expectation is to achieve market-leading profitability within the electric vehicle industry due to the lower operating expenditures associated with its microfactories, lower procurement costs associated with its in-house plug-and-play modular components and proprietary composite materials as well as the utilization of its proprietary in-house software architecture that reduces its manual labor expenses within the microfactories.*** Arrival estimates that its operational expense saving associated with its microfactories to be approximately 50% when compared to a traditional OEM facility with a similar production capacity. These savings, when combined with other operational and procurement savings, position Arrival to achieve double-digit margins on a per vehicle basis. Arrival believes this level of profitability to be industry leading.

51.    Arrival highlighted its ability to rapidly scale its microfactories and gave the following status update on the deployment of its four microfactories, reconfirming prior timelines: "Arrival currently has ***four microfactories in active development***, one in Rock Hill, South Carolina, USA, one in Charlotte, North Carolina, USA, one in Madrid, Spain and one in Bicester, UK, ***for start of production in the fourth quarter of 2021, the third quarter of 2022 and the third quarter of 2022, respectively.***" As to the North Carolina microfactory,

52.    As to Arrival's existing and potential orders for its vehicles, the Prospectus provided in relevant part:

> ***Arrival currently has an order from UPS for its Arrival Van for 10,000 vehicles with an option to purchase an additional 10,000 vans***, subject to amendment and cancellation by UPS. ***The total aggregate value of this order (including the option) is approximately $1.2 billion. Arrival has also received non-binding memorandums of understanding from 16 customers expressing strong interest in the Arrival Van and Arrival Bus.*** Although non-binding, Arrival believes they demonstrate clear demand that will lead to binding orders

once they begin production of the Arrival Bus and Arrival Van and potential customers are able to see firsthand the performance and value of these vehicles.

53.     Furthermore, Arrival represented that it planned on achieving profitability once production and sales of its vehicles commenced, "which is expected with respect to the Arrival Bus in Q4 2021, the Arrival small van in Q3 2022 and the Arrival large van in Q4 2022." Arrival reiterated these deployment timelines elsewhere in the Prospectus.

54.     On the same day, June 17, 2021, Arrival participated in a Deutsche Bank Global Auto Industry Virtual Conference ("Deutsche Bank Conference"). During the Deutsche Bank Conference, securities analyst from Deutsche Bank, Emmanuel Rosner, asked whether Arrival "was on track to begin production in the fourth quarter in the U.S." In response, Defendant Ableson gave the following evasive answer:

> So I'll take that one. We've got approximately 70% of the equipment for the Rock Hill, South Carolina plant, where we intend to start production of the bus, and 70% of equipment is on order. It's starting to arrive, and obviously, through the rest of the year, then, we'll be installing the equipment and commissioning the equipment in preparation for starting [ph] production.

Picking up on the vagueness of Defendant Ableson's answer, Rosner reiterated his question, and the following exchange took place:

**[Deutsche Bank Analyst]**:  "Okay, great. So that's a yes? . ."

**Ableson:**                "The plant is – the plant is moving along very well."

**Sverdlov:**               "Yes."

55.     When asked about "how are [the microfactories] progressing" Defendant Sverdlov gave equally evasive answer, stating as follows:

> If your supply chain doesn't work in -- just in time more [ph] than other things, so it's all makes impact on your ability to produce. Our environment is certainly different. So microfactories is very small factory which can be controlled and we don't need to be like in materials (inaudible), and so on [ph].

17

So I will say it this way. ***When first [ph] factory starts to work, this moment, which we call zero to one, it means that we [ph] already in the mode when everything works [ph]. Putting other factories in the same mode is quite straightforward process.***

I would even compare it trouble with something like McDonald's. I mean, so you have the restaurant which you have framework and the blueprints, ***and other stuff, opening the new one is quite straightforward thing [ph] how to do that. So that's the way how we see our model.***

So our main focus right now is to enable the first factories in different geographies, because we hire people, we train them, we can follow [ph] the documentation, we bring components, ***so when it works, scalability is not the problem. We don't see it as challenge. So after that, we can open many, many factories [ph].***

And then, we have the answer that the current business plan, which we were presenting before, ***it means that we will have 31 microfactories by the end of 2024, so -- and we are keeping our guidance on that. So we're [ph] –***

56.     In addition to reassuring the investors of Arrival's anticipated timeline for microfactories deployment, Defendant Sverdlov reconfirmed that the four models of Arrival vehicles are scheduled "by the end of 2023. So the first one is going to be bus Q4 this year, and then van and another one [ph] is scheduled for 2023 [ph]."

57.     On August 12, 2021, Arrival issued a press release releasing its financial results for the second quarter of 2021. The press release quoted Defendant Sverdlov, stating that Arrival has experienced "tremendous growth" and giving further details on Arrival's progress in deploying its Charlotte, North Carolina microfactory, stating that the site was "due to complete construction in October of this year with equipment to be ordered in 2022."

58.     On the same day, the Company held an Earnings Call to discuss Arrival's second quarter results ("Q2 Earnings Call"). During the call, Defendant Ableson confirmed Arrival's plans to deploy three microfactories in 2023, stating:

***We are committed to four micro factories next year.*** We continue to look at other potential locations. . . . ***And again, because we can roll out microfactories so quickly, we don't have to make a decision even now*** on where exactly that

fourth microfactory will be next year, so it will be a van microfactory, but we haven't announced timing yet.

59.     The statements described above in paragraphs ¶¶ 24-59 we materially false and misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects, including information that: (i) the Company would record a substantially greater net loss and adjusted EBITDA loss in the third quarter of 2021 compared to the third quarter of 2020; (ii) the Company would experience far greater capital and operational expenses required to operate and deploy its microfactories and manufacture EVs than disclosed; (iii) the Company would not capitalize on or achieve profitability or provide meaningful revenue in the time periods disclosed; (iv) the Company would not achieve its production and sales volumes; (v) the Company would not meet the disclosed production rollout deadlines; (vi) accordingly, the Company materially overstated its financial and operational position and/or prospects; and (vii) as a result, the Company's public statements were materially false and misleading at all relevant times.

## THE TRUTH BEGINS TO EMERGE

60.     On November 8, 2021, Arrival reported its third quarter 2021 results. In it, Arrival revised its 2022 outlook regarding microfactory rollout, revenue, and vehicle volumes, stating in relevant part:

### Updates 2022 and Long-term Outlook

Arrival previously provided long-term forecasts in connection with its merger with the CIIG special purpose acquisition company. Since then Arrival has invested more to further develop its platforms, and to secure components and batteries for production. As a result ***Arrival has revised its Microfactory rollout, and now expects significantly lower vehicle volumes and revenue in 2022. Future growth is dependent on the number of Microfactories the Company can deploy, which is a function of its access to capital. As a result Arrival's previous long-term forecasts from the merger should no longer be relied upon.***

***Bus and Van production volumes in 2022 are expected to be modest because 2022 is the first year the Company is starting production and it is now expecting a more conservative ramp in each of its first three Microfactories.***

*Arrival expects to start each Microfactory on one shift and does not expect them to reach full capacity until early 2023. Furthermore due to capital constraints Arrival has moved its fourth Microfactory to 2023.* Revenue is expected to start to be recognized in the second half of 2022 and will be weighted towards the fourth quarter. These expectations are dependent upon the successful completion of certification of Arrival's vehicles.

*Arrival continues to expect Van Microfactories to produce 10,000 vehicles per year when they reach full capacity on two shifts* and the Company's future volume mix to be even more weighted toward Van as it continues to see strong interest in this platform.

61.     Furthermore, Arrival disclosed that it is incurring several categories of additional costs, stating:

**Other Company Costs**

- In order to de-risk start of production and enable Arrival to scale, the Company is incurring additional costs, including: 1) a decision to assemble battery modules and bring logistics in-house, which is adding Capex and Opex; 2) pre-payments to LG Energy Systems to secure battery cell line capacity for the next several years; and 3) higher Selling, General and Administrative expenses as Arrival scales sales, finance and legal.

- In addition, Arrival is experiencing industry-wide increases in the expected cost of raw materials including aluminum and petrochemicals

- Arrival also expect higher working capital in its first factories to ensure the Company has the necessary components and parts to start production of its vehicles

62.     During the Earnings Call following the release of the third quarter results, Arrival's Chief Financial Officer, John Wozniak relayed the dramatic departure from previous plans, stating in relevant part:

We are also experiencing price increases in certain raw materials, including aluminum and petrochemicals. Because we are investing more in our platforms, we have revised our microfactory investments for next year. We now plan three Microfactories in 2022, Rockhill, Bicester and Charlotte and have moved our fourth microfactory to 2023. We continue to expect van Microfactories to produce 10,000 vehicles per year at full capacity on two shifts. Though, we are expecting a more conservative production ramp next year, as we start each

microfactory on one shift and are not planning to reach full capacity until early in 2023.

As a result, we expect both vehicle volumes and revenue to be modest next year. Revenue is expected to start in the second half of 2022 and be weighted towards the fourth quarter. As Denis mentioned, beyond 2022, revenue growth will be dependent on the number of Microfactories we can deploy, which is a function of the timing and availability of capital. The quantum in timing of which is uncertain at this time. Given this and the rapidly changing nature of our business, we no longer believe prior long-term financial forecast should be relied upon.

63.     Upon the publication of this news, on November 8, 2021, Arrival's stock price plummeted $4.33, or 24%, to close at $13.46 on November 10, 2021 on unusually high trading volume, with several securities analysts lowering Arrival's price target. For example, Cowen analyst Jefffey Osborne has lowered Arrival price target to $17 from $28.50, pointing to "modest production, which was undefined."

64.     Unfortunately for investors, the bad news was not over. Only a week later on November 17, 2021, Arrival announced a $200 million offering of green convertible senior notes due 2026, intended to finance the development of green vehicles.

65.     On the same day, November 17, 2021, Arrival announced the commencement of an underwritten public offering of 25 million ordinary shares pursuant to a registration statement on Form F-1 filed with the SEC in a bid to raise around $330 million in cash.  Arrival has upsized its public follow-on offering on November 19, 2021 to $32.37 million at an offering price of $9.50 per share, representing a 4% discount on the Company's offering price as of November 18, 2021. The offering closed on November 23, 2021.

66.     Via Arrival's November 17 and November 19 disclosures, the market has learned that Arrival has been burning through its capital resources at a much greater rate than disclosed, and as a result, was in a dire need for additional capital in order to finance its operations. Thus,

investors realized that Arrival's prior representations of its ability to capitalize on EVs production and achieve profitability could not have been further from the truth.

67.     On this news, Arrival shares dropped $0.82, or approximately 8%, to close at $9.91 on November 18, 2021 on unusually high trading volume.

## CLASS ACTION ALLEGATIONS

68.     Plaintiffs bring this action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on its own behalf and as representative of a Class, consisting of all those who purchased or otherwise acquired Arrival shares during the Class Period ("Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

69.     The Class is so numerous and geographically dispersed that joinder of all members is impracticable. Throughout the Class Period, Arrival shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be readily identifiable from information and records in the possession of Defendants or the Company's transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

70.     Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and members of the Class sustained damages from the same wrongful conduct of Defendants. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws described herein.

71.     Plaintiffs will fairly and adequately protect and represent the interests of members of the Class. Plaintiffs are adequate representatives of the Class and have no interest which is averse to the interests of absent Class members. Plaintiffs have retained counsel competent and experienced in class action litigation, including class actions in the financial services industry.

72.     Common questions of law and fact exist as to all members of the Class, which predominate over questions affecting solely individual members of the Class. These common questions of law include, without limitation:

- whether statements made by Arrival and the Individual Defendants to investors during the Class Period included misrepresentations of material facts about the financial condition, operations and oversight of operations at Arrival;

- whether Arrival and the Individual Defendants acted knowingly or recklessly in issuing false and misleading statements or omitting material information that would correct the misstatements;

- whether Arrival's and the Individual Defendants' acts as alleged herein constituted violations of the federal securities laws;

- whether the prices of Arrival shares during the Class Period were impacted by Arrival's and the Individual Defendants' conduct described herein;

- injury suffered by Plaintiffs and Class members; and

- the appropriate measure of damages suffered by Plaintiffs and Class members.

73.     A class action is superior to other methods for the fair and efficient adjudication of the controversy because joinder of all Class members is impracticable. Treatment as a class will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.

74.     Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The

prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Arrival and the Individual Defendants.

75.     Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## FRAUD ON THE MARKET DOCTRINE

76.     The market for Arrival shares was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Arrival's shares traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's shares relying upon the integrity of the market price of Arrival shares and market information relating to Arrival, and have been damaged thereby.

77.     During the Class Period, the artificial inflation of Arrival's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Arrival's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Arrival's financials and its business, operations, and prospects, thus causing the price of the Company's shares to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Arrival shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing Arrival shares at such artificially inflated prices, and each of them has been damaged as a result.

78.     Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine as:

- Arrival and the Individual Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- these misrepresentations and omissions were material to Plaintiffs and the Class;

- Arrival shares were traded on the NASDAQ and were covered by numerous analysts;

- Arrival shares were liquid and traded with significant volume during the Class Period;

- the misrepresentations and omissions alleged herein would likely induce a reasonable investor to misjudge the value of the Arrival shares; and

- Plaintiffs and Class members purchased and/or sold Arrival shares between the time Arrival and the Individual Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

79.     As a result of the foregoing, the market for Arrival shares promptly digested current information regarding Arrival from all publicly available sources and reflected such information in Arrival's share price. Under these circumstances, all purchasers of Arrival's shares during the Class Period suffered similar injury through their purchase of Arrival's shares at artificially inflated prices. Thus, a presumption of reliance applies.

80.     Accordingly, Plaintiffs and Class members are entitled to a presumption of reliance upon the integrity of the market.

81.     In the alternative, Plaintiffs and Class members are entitled to a presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 1456 (1972), because Defendants omitted material information during the Class Period violating a duty to disclose such information as described above. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were

obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## **LOSS CAUSATION**

82.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

83.     During the Class Period, Plaintiffs and the Class purchased Arrival's shares at artificially inflated prices and were damaged thereby. The price of Arrival shares significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## **NO SAFE HARBOR**

84.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements and omissions pled in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and circumstances. To the extent certain of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pled herein, Arrival and the Individual Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the

particular forward-looking statement was false and misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Arrival who knew that those statements were false and misleading when made.

### SCIENTER ALLEGATIONS

85.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Arrival and Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Arrival, their control over, and/or receipt and/or modification of Arrival's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Arrival, participated in the fraudulent scheme alleged herein.

86.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including Individual Defendant.

87.     The Individual Defendants, because of their positions with Arrival, made and/or controlled the contents of the Company's public statements during the Class Period. Each Defendant was provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-

public information, these Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were materially false and misleading. As a result, each of these Defendants is responsible for the accuracy of Arrival's corporate statements and are therefore responsible and liable for the representations contained therein.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**(Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder)**
**Against All Defendants**

88.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

89.     During the Class Period, Arrival and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved false statements which they knew or deliberately disregarded in that they contained misrepresentations and failed to disclose material facts to make the statements made not misleading.

90.     Arrival and the Individual Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 by: (a) making false statements of material facts or omitted to state material facts needed to make the statements not misleading; or (b) engaging in acts and practices that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with purchases of Arrival shares during the Class Period.

91.     Arrival and the Individual Defendants acted with scienter because they knew that the statements issued in the name of Arrival were materially false and misleading; knew that these statements would be disseminated to investors; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of these statements as primary violations of securities

laws. Arrival and the Individual Defendants, through receipt of information reflecting true facts about Arrival, their control over, and/or receipt of or modification to Arrival's allegedly materially misleading statements, which made them aware of Arrival's confidential proprietary information, participated in the fraudulent scheme complained of herein.

92.     The Individual Defendants had actual knowledge of material omissions and/or the falseness of material statements set forth by Arrival, and intended to deceive Plaintiffs and Class members, or at a minimum, recklessly disregarded the truth through their failure to ascertain and disclose the truth in statements made by them or other Arrival employees to investors, including Plaintiffs and Class members. These misrepresentations and omissions were material. A reasonable investor would consider the facts—such as the structural unprofitability of Arrival's core subscription model—important in deciding whether to buy shares of Arrival stock and would have viewed the aggregate of information available to be significantly altered by the disclosure of this and other material facts

93.     Pursuant to the foregoing, the price of Arrival shares were artificially inflated during the Class Period. Due to their lack of knowledge of the false nature of statements made by Arrival and the Individual Defendants, Plaintiffs and Class members relied on the statements made by Arrival and the Individual Defendants and/or the integrity of the market price of Arrival shares during the Class Period in purchasing Arrival shares at prices that were artificially inflated due to false and misleading statements made by Arrival and the Individual Defendants.

94.     Were Plaintiffs and Class members made aware that the market price of Arrival shares were artificially and falsely inflated by misleading statements made by Arrival and the Individual Defendants, and by material adverse information that Arrival and the Individual Defendants failed to disclose, they would not have purchased Arrival shares at artificially inflated

prices, or purchased them at any price.

95.     Based on the wrongful conducted alleged herein, Plaintiffs and Class members have suffered damages in an amount to be determined at trial.

96.     Arrival and the Individual Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and Class members for significant damages suffered via their purchases of Arrival shares during the Class Period.

### SECOND CLAIM FOR RELIEF

**(Violation of Section 20(a) of the Exchange Act)**
**Against the Individual Defendants**

97.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

98.     During the Class Period, the Individual Defendants were involved in the management and operation of Arrival's business affairs. Due to their senior positions, they had knowledge of adverse non-public information regarding Arrival's business model, strategy, valuation, and revenue targets and goals and false representations in connection therewith.

99.     As directors and/or officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information regarding Arrival's financial condition and results of operations, and to correct any public statements issued by Arrival which were materially false or misleading.

100.    Due to their positions of authority at Arrival, the Individual Defendants controlled the contents of various public filings, press releases and reports which Arrival disseminated in the market during the Class Period. During the Class Period, the Individual Defendants utilized their authority to cause Arrival to execute the wrongful acts alleged herein. The Individual Defendants were therefore "controlling persons" at Arrival pursuant to Section 20(a) of the Exchange Act. On

this basis, they were participants in the unlawful conduct alleged which caused the prices of Arrival shares to be artificially inflated.

101.    Based on the conduct described above, the Individual Defendants are liable for the violations committed by Arrival pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully demand relief as follows:

A.    Certifying this lawsuit as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as Class Representatives;

B.    Awarding damages in favor of Plaintiffs and members of the Class against Arrival and the Individual Defendants, jointly and severally, for all damages sustained as a result of Arrival's wrongdoing, in an amount to be proven at trial;

C.    Awarding Plaintiffs and members of the Class their costs of suit, including reasonable attorneys' fees and expenses, and including expert fees, as provided by law;

D.    Awarding Plaintiffs and members of the Class pre- and post-judgment interest at the maximum rate allowable by law; and

E.    Directing such further relief as it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demands a jury trial as to all issues triable by a jury.

Dated: December 22, 2021

                                  **LOWEY DANNENBERG, P.C.**

                                  _/s/ Andrea Farah_____
                                  Andrea Farah
                                  Margaret MacLean
                                  David C. Harrison
                                  Richard Frank

44 South Broadway, Suite 1100
White Plains, New York 10601
Telephone: 914-997-0500
Email: afarah@lowey.com
      mmaclean@lowey.com
      dharrison@lowey.com
      rfrank@lowey.com

*Counsel for Plaintiffs*

SWORN CERTIFICATION OF PLAINTIFF PURSUANT TO THE FEDERAL SECURITIES LAWS

I Bruch Schmutter, certify that:

1. I have reviewed the Complaint and authorize its filing and/or the filing of a Lead Plaintiff motion on my behalf.

2. I am duly authorized to institute legal action against Arrival SA and other defendants.

3. I did not purchase Arrival SA securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

4. I am willing to serve as a representative party(s) on behalf of a class and will testify at deposition and trial, if necessary.

5. My transactions in Arrival SA's securities during the Class Period are set forth below.

6. I have not sought to serve, nor served, as a representative party on behalf of a class under this title during the last three years.

7. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.


December      22      , 2021                               Bruce Schmutter
Date                                                                B6FD426A4ABE4CC...
                                                                         Bruce Schmutter

Bruce Schmutter's Transactions in Arrival's securities during the class period:

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 12/8/2020 | Buy | 500 | $    33.50 |
| 1/5/2021 | Sell | 500 | $    26.59 |
| 1/11/2021 | Buy | 175 | $    26.92 |
| 1/15/2021 | Buy | 400 | $    31.64 |
| 2/1/2021 | Buy | 360 | $    28.84 |
| 2/23/2021 | Sell | 935 | $    24.87 |
| 3/10/2021 | Buy | 1000 | $    21.94 |

SWORN CERTIFICATION OF PLAINTIFF PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Dean Samet, certify that:

1.  I have reviewed the Complaint and authorize its filing and/or the filing of a Lead Plaintiff motion on my behalf.

2.  I am duly authorized to institute legal action against Arrival SA and other defendants.

3.  I did not purchase Arrival SA securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

4.  I am willing to serve as a representative party(s) on behalf of a class and will testify at deposition and trial, if necessary.

5.  My transactions in Arrival SA's securities during the Class Period are set forth below.

6.  I have not sought to serve, nor served, as a representative party on behalf of a class under this title during the last three years.

7.  I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

December ____22____, 2021
Date

DocuSigned by:
*Dean Samet*
C4C6B249B33C4D0...
Dean Samet

DocuSign Envelope ID: F88E6DE8-E60D-4BEC-9CED-57C6F568258B

Dean Samet's Transactions in Arrival SA's securities during the class period:

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 12/9/2020 | Buy | 80 | $ 30.00 |
| 12/17/2020 | Buy | 100 | $ 29.25 |
| 1/11/2021 | Buy | 200 | $ 27.25 |
| 1/11/2021 | Buy | 120 | $ 27.05 |
| 1/19/2021 | Buy | 100 | $ 29.30 |
| 1/21/2021 | Buy | 100 | $ 28.32 |
| 1/25/2021 | Buy | 300 | $ 27.00 |
| 1/27/2021 | Buy | 997 | $ 26.76 |
| 1/27/2021 | Buy | 3 | $ 26.71 |
| 2/4/2021 | Buy | 500 | $ 28.50 |
| 2/4/2021 | Buy | 500 | $ 28.25 |
| 2/4/2021 | Buy | 500 | $ 28.25 |
| 2/19/2021 | Sell | 30 | $ 26.88 |
| 2/23/2021 | Sell | 170 | $ 25.45 |
| 2/23/2021 | Sell | 1,030 | $ 25.05 |